IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 25, 2009

STATE OF TENNESSEE v. SCOTT LEE MYERS

Appeal from the Criminal Court for Bradley County
No. 07-216    Carroll L. Ross, Judge

No. E2008-00971-CCA-R3-CD - Filed August 17, 2009

A Bradley County jury convicted the defendant, Scott Lee Myers, of second degree murder. The defendant appeals, arguing that the trial court erred by improperly qualifying two police officers as expert witnesses and that the evidence was insufficient to sustain his conviction. Discerning no error, we affirm the judgment of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

C. Richard Hughes, Jr. (at trial and on appeal), District Public Defender; and Larry D. Wright (at trial), Assistant District Public Defender, for the appellant, Scott Lee Myers.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; R. Steven Bebb, District Attorney General; and Stephen M. Hatchett, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

At trial Tammy Lane Turner testified that she last spoke with her daughter, Pamela Lane, the victim in this case, on May 4, 2007. She said that at that time, "my daughter . . . told me if I didn't hear from her . . . come to Bradley County and report it." Accordingly, when Turner had not heard from her daughter by Mother's Day (Sunday, May 13), she decided to leave her South Carolina home and file a missing person report. She filed this report with the Bradley County Sheriff's Department on Monday, May 14, 2007. She acknowledged that her daughter had a history of methamphetamine use, but she claimed that her daughter had not used methamphetamine for "at least three years"

before her death. Turner also acknowledged that her daughter had suffered from bipolar disorder and severe depression and had twice "made an attempt with a knife to harm herself."

Bobby Singleton testified that she last saw the victim "in the mid-evening" hours of May 4, 2007. She said that the victim left Singleton's house with the defendant. Singleton acknowledged that she was aware that the victim and the defendant were romantically involved and that they had applied for a marriage license.

Officer Richard Harris with the Collegedale, Tennessee, Police Department testified that on May 24, 2007, he attempted to stop a black pickup truck registered to the defendant. Officer Harris saw the defendant's truck run a stop sign, which led him to pull behind the defendant's truck. After Officer Harris pulled behind the defendant, the defendant's truck accelerated and began traveling at a high rate of speed. The officer activated his lights and sirens in an attempt to stop the vehicle, but the defendant sped away. Officer Harris chased the defendant for approximately five minutes before his supervisor ordered him to stop the chase.

Detective Angie Whittemore with the Bradley County Sheriff's Department testified that she investigated the victim's disappearance. She said that she tried to contact the defendant "numerous times," and that the defendant called her on May 23 and May 31, 2007. She learned from the sheriff's department in Bay County, Florida, that the defendant had been arrested there, so she went to Bay County. While there, Detective Whittemore took custody of two Ruger pistols, one a model P90 and the other a model P97, that Bay County detectives had found in the defendant's truck. She submitted these guns to the Tennessee Bureau of Investigation (TBI) crime lab for testing.

Detective Jimmy Smith with the Bradley County Sheriff's Department testified that after the victim was reported missing, he went to the defendant's house, where the defendant's ex-wife, Susan Myers, was conducting a yard sale. The detective said that he heard a "thump" in the laundry room and attempted to go into the house, but Ms. Myers would not let him into the house.

Captain Jimmy Stanford with the Bay County, Florida, Sheriff's Department testified that he spoke with the defendant while the defendant was in custody at the Bay County police station. After being advised of and waiving his Miranda rights, the defendant told the police that the victim had shot herself under her chin while he was speaking with her.[1] The defendant said that he reached for the victim's gun, a .45 caliber pistol, as she held it, but "[b]y the time he grabbed the gun, she had already shot herself." The defendant then told the police that he placed the victim's body in a garbage can, which he taped closed and buried in a graveyard. The defendant drew a map depicting where he had buried the victim; Captain Stanford gave this map to the Bradley County authorities.

On cross-examination, Captain Stanford acknowledged that the defendant was arrested on "some old bad checks charges" unrelated to the instant case. He said that as the defendant was arrested, "he mentioned . . . [that] he worried that [the victim] might have been killed." Captain

---

[1]No audio recording or transcript of this interview was submitted as an exhibit at trial.

Stanford said that another officer was present during the interview, and when the officer asked the defendant to be specific about how the victim shot herself, the defendant said that he focused mainly on the victim's gun because he saw that it was cocked. However, Captain Stanford insisted that he was "absolutely sure [the defendant] was saying she was shot under the chin. . . . I didn't see any discrepancies in what he was saying."

Investigator David Pitts with the Bay County Sheriff's Department testified that he was the other officer who interviewed the defendant in Florida after his arrest. He said that the defendant told police that he had seen the victim "standing somewhere in the area where the washing machine was, and that she had a weapon under her chin." The defendant said that he "started to lunge for [the gun] and she pulled the trigger." Investigator Pitts denied that the defendant said "anything about the gun moving . . . [or] coming higher up on her face;" he said that in questioning the defendant, he "wanted to . . . make sure where the point of impact would be in case it was needed at a later point, once they recovered her." On cross-examination, Investigator Pitts acknowledged that when the defendant first spoke with the Bay County officers, he told the police that he thought the victim was still alive. He also acknowledged that during the interview, the defendant said that his focus was on the victim's gun, which was "locked and loaded; the hammer was back."

Detective Sergeant Jimmy Woody with the Bradley County Sheriff's Department testified that the evening of May 31, 2007, he and other officers went to the cemetery where the defendant said that he had buried the victim's body. While the police did not locate anything at the exact spot indicated by the defendant, in the morning hours of June 1 the police, with the assistance of cadaver dogs, found a garbage can containing the victim's body.

Lieutenant Barry Tharp with the Bradley County Sheriff's Department[2] testified that he supervised the section of his department that processed crime scenes and administered the crime lab. He said that on the morning of June 1, 2007, he and two other officers collected evidence in the defendant's residence, where the victim was shot. Specifically, the officers collected evidence in the laundry room, located in the basement of the residence. Lieutenant Tharp said that using a 450-nanometer scope "crime scene light," he found what appeared to be blood on one of the room's walls. He said that the blood spatter extended "from the floor to about three feet up the wall." The officers cut the section of the drywall containing the blood spatter from the rest of the wall and took it back to the crime lab for further testing; Lieutenant Tharp commented that "the best method of [processing] evidence is if the item can be removed and taken with you, then that's what you do." He testified that he "put a label on each specific blood stain or blood spatter to document the number and where they were on the wall."

Lieutenant Tharp also said that "there was no blood on the floors" of the laundry room, which led him to conclude that the floors had been cleaned. He added, "[I]f somebody had been shot and

---

[2]This witness and Emily Hamstra, a Bradley County Sheriff's Department crime scene investigator, were accepted by the trial court as expert witnesses. The defendant challenges this ruling on appeal. The testimony regarding the witnesses' qualifications will be explored later in this opinion; at present, we will confine our review of their trial testimony to their evidence collection methods and the conclusions they drew therefrom.

killed there and laid there for any length of time or been moved from there, there should have been some transfer patterns or pools of blood . . . ." He also said that he found what appeared to be blood on a paper shredder and a bottle of bleach inside the room. The shredder, the bleach bottle, and certain sections of the wall were sent to the TBI crime lab for testing.

Lieutenant Tharp also saw that the carpet inside the defendant's garage was missing a section, which appeared to have been cut away. He therefore removed the carpet from the crime scene. While removing the carpet, he saw what appeared to be a blood stain on the underside of the carpet. Lieutenant Tharp testified that at the victim's autopsy, the medical examiner found a section of carpet inside the trash can in which the victim was buried. He sent the carpet from the garage and the carpet section found in the trash can to the TBI crime lab to determine if the two items came from the same source.

Emily Hamstra, a crime scene investigator with the Bradley County Sheriff's Department, began her testimony by explaining her qualifications and training and the methodology behind blood spatter analysis. As relevant to this case, she testified that she "measured individually each of the blood stains" found on the wall taken from the defendant's laundry room. Based on these measurements, she determined the angle at which each of the drops hit the wall. She then "looked to see what direction the drops were coming from." Based upon the angles of impact and the direction from which the blood hit the wall, she determined an "area of origin" from which the blood originated. Her analysis led her to conclude that "[t]he area of origin where those blood drops came from could have been no higher than three feet from the floor." Investigator Hamstra added that she attended the victim's autopsy, and the victim's only noticeable injury was a gunshot wound to her face. She added that her testing was not affected by the fact that the section of the wall had broken before she examined it.

On cross-examination, Investigator Hamstra said that she cut "three or four" blood-stained sections from the wall and sent them to the TBI lab for testing. When asked whether she tested those areas of the wall where no blood was found to determine whether they had been cleaned, she replied, "I'm not sure that we can test to see if it had been cleaned." She said that the blood drops on the lower part of the wall hit the wall at a 90 degree angle, while the angles of those drops that hit farther up the wall varied; "we had some in the 40's and 30's and 20's, all the way on [until] I believe there was one that was about a 10-degree angle." She added that when she tested the wall, it was leaning against the door to the lab's garage. However, she "did take the leaning of the wall into consideration when [she] formed [her] opinion." She also noted that Lieutenant Tharp "also [did] some measurements of the blood drops, and we compared to see that we were getting . . . the same measurements. And also when I did the math, I triple checked my figures."

Dr. Darinka Mileusnic-Polchan, a forensic pathologist, testified without objection that she conducted the victim's autopsy. She said that the victim was still inside the garbage can when she was brought to the medical examiner's office. Dr. Mileusnic-Polchan said that the top of the garbage can was covered with a garbage bag and "secured" with duct tape, which was wrapped around the top of the can in a "very orderly . . . methodical way." She said that she had to cut away the tape atop the can to open the can, and that "it took me and two of my assistants a couple of hours to open the

can and go layer by layer to the body."

Dr. Mileusnic-Polchan testified that the victim's cause of death was a gunshot wound, and she characterized the manner of death as a homicide. She said that the bullet entered the left side of her face, near the left nostril, then traveled "front to back, left to right . . . either directly or slightly downward." She noted the presence of gunpowder staining near the entrance wound, but because of the decomposition of the victim's body, "some of the features of the gunshot wound of entrance were altered." The bullet lodged inside the back of the victim's head, near her neck. Dr. Mileusnic-Polchan noted that the jacket of the bullet was retained in the brain tissue.

Dr. Mileusnic-Polchan said that her determination that the victim's death was not a suicide was based "not only on the autopsy, but also the scene investigation and history, social and medical." As relevant to the autopsy findings, she said that there was no evidence of "hesitation marks," which she described as "fresh or healed injuries indicating the cutting of the wrists." She said, "If there were real hesitation marks, real cuts," the victim's decomposition would not affect her ability to find these injuries because in such cases, "the subcutaneous tissue would still show the scar." She also noted that the victim's blood alcohol content was 0.05%, but she warned that "as the body decays . . . [it] produces alcohol." She added that the victim's blood alcohol content was the "normal level of alcohol for the body that is decaying."

On cross-examination, Dr. Mileusnic-Polchan said that while four police officers were present at the autopsy, and while they talked about the defendant being suspected in the victim's death, the police did not talk about the evidence that had been collected at the defendant's house. She noted that in her report, she identified the presence of gunpowder residue near the entrance wound, which indicated that the gun was close to the victim's face at the time the gun fired. However, Dr. Mileusnic-Polchan said that because of the victim's decomposition, she could not determine how close the gun was to the victim's face at the time it fired. She also admitted that if the victim had inflicted some "very superficial" cuts to her wrists, there would be no evidence of those injuries at the time of the autopsy. Regarding the results of the victim's blood alcohol test, Dr. Mileusnic-Polchan said that if the victim had been drinking alcohol the night of her death, that blood would not have metabolized because "the liver metabolizes alcohol . . . the liver is not functioning if one is dead." She acknowledged that because the manner of testing for other drugs is different from testing for alcohol content, there would be "no way of determining . . . what type of medication or narcotic [could have been] in her system at the time of the shooting."

Three agents with the TBI Crime Lab testified regarding their testing of certain evidentiary items. Agent Charles Hardy testified that the DNA present in the blood found on three items in the defendant's laundry room—the wall, a bleach bottle, and a paper shredder—matched the victim's DNA profile. Agent Linda Littlejohn testified that she tested the carpet taken from the defendant's garage and the section of carpet found in the trash can in which the victim was buried. She said that the two sections of carpet were joined at one point before they were cut apart. Agent Shelly Betts testified that she tested the bullet and jacket that were removed from the victim's body during the autopsy. She said that the bullet and jacket were consistent with being fired from one of the Ruger pistols found in the defendant's truck when he was arrested in Florida. On cross-examination, she

acknowledged that she was not asked to test the victim's clothing for gunshot residue. She said that if the Ruger were cocked, four pounds of pressure per square inch would be required to fire the weapon. On redirect examination, she said that the defendant's Ruger pistol did not have a "hair trigger."

Detective Dean Beverly with the Cleveland Police Department testified that at the time of the victim's death, his department was investigating the defendant for embezzlement involving the defendant's employer. The detective said that the defendant was suspected of submitting invoices bearing the victim's name. The employer then wrote checks based upon the invoices; these checks were cashed. Detective Beverly suspected the defendant was forging the victim's endorsement on these checks. The detective said that the victim had been subpoenaed to testify against the defendant in front of the Bradley County Grand Jury, although she had not testified at the time of her death.

The defendant testified that he met the victim in 2005 and that they moved in together in either February or March 2006. He said that they were both aware of each other's problems; she knew about the defendant's criminal record, which included convictions for burglary, theft, and vandalism, and he knew about her drug usage. He said that when he first met the victim, she used "ice," or methamphetamine, and took prescription medication such as Xanax and Oxycontin without a prescription. He also knew that the victim had mental health problems such as depression and bipolar disorder. He encouraged the victim to see a counselor, which she did for a while before stopping. He claimed that on the counselor's advice, he kept knives and guns away from the victim.

The defendant said that in January 2007, he and the victim moved into the home where the victim died. He testified that although he never hit her and she never sought an order of protection against him, she moved out of the house around April 1 and moved in with Bobby Singleton. However, he said that he and the victim continued to see each other, with the victim occasionally spending the night at his house. He said that on May 2, the couple applied for a marriage license in Bradley County.

The defendant said that he had set up another company for his former employer and that the victim was one of the persons whom he hired. He said that although the victim was a good employee, his employer made him fire her because they lived together. Regarding the allegations that he stole from his former employer, he acknowledged that the criminal complaint was filed against him on March 15, 2007, and that a preliminary hearing was scheduled on May 1. He said that the hearing was continued because "[n]obody showed up to hear the case" and "[n]obody on the prosecution side showed up." He denied stealing from his employer and said that he "knew" he would win the case if it went to trial. Regarding the victim's potential grand jury testimony, the defendant said, "As far as I knew, she had refused to do anything against me. She said that she would never go against me, because I'd been too good to her and her kids."

The defendant testified that on May 4, 2007, he picked up the victim at Bobby Singleton's house. The two eventually went to a Veterans of Foreign Wars (VFW) Post, where they drank alcohol. The victim called her friend, Teresa Cochran, who, along with a male companion, met the

victim and the defendant on the route home from the VFW and followed them to the defendant's home. The four met at the defendant's home around midnight and spent some time singing karaoke, drinking, and smoking marijuana. The defendant said that the victim also took pills that night. The defendant said that later that night, he saw the victim and Cochran engaged in oral sex, which upset him. He was also upset with the victim because when he had announced to someone at the VFW Post that he and the victim were getting married, the victim scolded the defendant, telling him to be more secretive about their plans. Despite his anger with the victim, the defendant allowed her, Cochran, and Cochran's companion to spend the night at his residence.

The defendant testified that at some time between 3:00 and 4:00 that morning, he and the victim began to argue. After the argument, the victim began yelling that the defendant had called the police and that Cochran and her companion needed to "get the marijuana out of the house and leave." The defendant's guests then left angrily. The victim and the defendant continued their argument in the house's basement. At one point, the defendant called his ex-wife and told her to come by the house and pick him up. The defendant packed a bag with some belongings; as he was walking toward the back door of the house, near the garage, he saw the victim in the laundry room. The defendant said that the victim held a .45 caliber pistol under her chin. The defendant and the victim got into another argument, during which the defendant approached the victim, intending to take the gun from her. The defendant claimed that as he approached the victim, he noticed that "the hammer was back, which led me to believe that there was a round in that weapon." The defendant reached for the weapon, but the gun went off just before he grabbed it and threw it behind him. He said that the victim was "standing upright" when she shot herself, adding, "Pam would never get on her knees for [any]body."

The defendant admitted that he did not call the police after the shooting; instead, he put the victim's body in a trash can, buried it in a cemetery, and tried to clean the victim's blood from the laundry room. The defendant said that he found blood on the room's walls, shelves, a washer and dryer, a door, and the ceiling. He initially attributed these decisions to "very bad judgment" rather than an attempt to conceal a crime, but later during direct examination, when asked if his cleaning the victim's blood from the laundry room was an attempt "to conceal the crime," the defendant replied, "A little bit." However, he later testified that he in fact was not "trying to cover up a crime scene;" rather, he "was trying to get the house ready to be moved out of." He added that the yard sale he held shortly after the victim's death was in response to his ex-wife's threats to "have [him] thrown in jail for not paying child support since March."

The defendant testified that the police chase involving his truck and the Collegedale police officer occurred after he had retrieved his guns from a storage unit. While the officer testified that the chase lasted no more than five minutes, the defendant said that the chase lasted "approximately three hours." He said that he initially went to Atlanta "[b]ecause people had been shooting at me," then he went to Fort Benning, Georgia, in an attempt to see some friends. He said that he left the army base because his friends "were deployed." After leaving Fort Benning, the defendant went to Panama City, Florida. He claimed that he was at a marina selling first aid kits when "[a]bout six guys c[a]me out of nowhere [and] started chasing me. I don't know who they [were], why they're chasing me." Eventually, Bay County sheriff's deputies arrived and arrested him. The defendant

claimed that he was arrested on "some bad check charges from 15 years ago." He also told the deputies about the two guns in his truck, including the .45 caliber pistol that had been used in the shooting. He said that he "knew at some point that [the] weapon had to be turned over" and that he did not get rid of the gun because he did not kill the victim.

The defendant said that he initially told the officers that the victim had left his house with Cochran and was still alive, but he said he lied to the police because he "didn't trust them at first . . . I was feeling them out." Ultimately, he told the officers that the victim shot herself after an argument about drugs. He testified that he told the officers that he believed the victim shot herself in the chin because when he first saw the victim after the shooting, "[t]here were no big holes" in her face. He also drew a map depicting where he had buried the victim.

On cross-examination, the defendant said that he cut the section of his garage carpet and placed it in the trash can in which the victim was placed as "padding." He also said that he cleaned up blood off the floor with cedar shavings and rags; he put the rags in the garbage can. He said that he tried to make the garbage can into a "casket" and tried to "keep the animals from being able to get into the container." He also admitted that he did not talk to any law enforcement officials about the victim's death until he was arrested in Florida. The defendant denied that he would be facing significant jail time if he were convicted in the forgery and theft case involving his former employer and denied that he had learned that the victim was planning to testify against him before the grand jury.

Teresa Cochran testified that she saw several arguments between the defendant and the victim before the victim died, but that the arguments never involved "hitting, punching, or anything like that." She said that she and her companion arrived at the defendant's house between 11:30 and 11:45 the evening of May 4. Cochran and her companion intended to spend the night but they left when the victim began yelling at them, claiming that the defendant did not want them to stay at the house. As Cochran left, she asked the victim if she needed to come with her. The victim replied that she did not need to leave. Cochran testified that the defendant added, "I ain't gonna f—ing hurt her. Leave." On cross-examination, Cochran said that the victim said nothing about killing herself that night and talked about going to her son's birthday party the next morning.

The jury found the defendant not guilty of the indicted offense of premeditated first degree murder but found him guilty of the lesser included offense of second degree murder. The trial court later sentenced the defendant to twenty-three years in the Department of Correction. The defendant subsequently filed a timely notice of appeal.

ANALYSIS

I. Expert Testimony

The defendant first contends that the trial court erred by allowing Lieutenant Tharp and Investigator Hamstra to offer expert testimony regarding blood spatter analysis. The defendant contends that "the witnesses lacked qualification and [that] the measurements upon which the

-8-

analysis findings [were] based [were] not sufficiently reliable and trustworthy to assist the jury to interpret this evidence." The State contends that the trial court properly found that Investigator Hamstra was qualified to give expert testimony regarding blood spatter analysis and that the data upon which she based her conclusion were reliable.

*Lieutenant Tharp's Testimony Regarding His Qualifications and Analysis in this Case*

The defendant filed a pretrial motion in limine seeking to prevent Lieutenant Tharp and Investigator Hamstra from testifying as experts in blood spatter analysis. At the hearing on the motion, Lieutenant Tharp testified that he first received training in blood spatter analysis in the mid-1980s, when he "attended a homicide school that discussed the matter of blood spatter." He said that he had attended several "advanced crime scene schools since then" and that "[b]lood has always been dealt with, either about collection, appearance, [or] patterns." Lieutenant Tharp said that he had approximately eighty hours of advanced law enforcement training, although he had never testified as an expert in blood spatter analysis before this trial.

Lieutenant Tharp testified that in 2003, he took an advanced blood spatter course at the National Forensics Academy. He said that the course "went through all the aspects of the blood. We looked at drying time; we looked at surface tension; we looked at various angles." He further described the training he received at the class as follows:

> They, they go through - - and they simplify it. The training . . . teaches you basically how to measure, and you do hundreds of measurements in class on both patterns that are in a book . . . and from other scenes, and patterns they reproduce there. It's pretty simple. They simplify it so that you can put it in a calculator and come up with the, the figure for the blood spatter. You get . . . an angle, and then you can come off from the angle and find a point of convergence that goes back to the source of the blood.

He said that in this case, "the opinion is that [the victim] would have been probably about knee height, about three f[eet] from the floor" at the time she was shot.

On cross-examination, Lieutenant Tharp said that while his undergraduate and graduate degrees were in psychology and counseling, respectively, he had "gone back and done a year and-a-half in chemistry, and that has a lot of mathematics in it." He also said that the course he took at the National Forensics Academy "was a solid 40 hours of nothing but blood spatter." He insisted that his qualifications included not only his training at the Forensics Academy but also his attendance at several homicide courses since the mid-1980s; he said that these other courses "spent quite a bit of time dealing with blood spatter" and that the courses lasted "much [longer]" than "an hour or two." He also said that this case did not represent the first time where he had actually used this training in his work.

Lieutenant Tharp acknowledged that the wall on which the victim's blood was found was removed from the crime scene. He said that while the wall was photographed at the crime scene,

the measurements of the individual blood stains and the analysis regarding the origin and direction of blood spatter were conducted at the Bradley County Sheriff's Department crime lab. He added, "dealing with time and controls, if we can bring the scene to us and keep it, then we're much better off." He said that the wall broke in transit between the defendant's house and the crime lab but that the damage to the wall did not affect the analysis. Lieutenant Tharp said that Investigator Hamstra did most of the measurements in this case, although he checked some of her work. At the end of this testimony, the trial court ruled that Lieutenant Tharp could give expert testimony at trial regarding blood spatter analysis.

At trial, Lieutenant Tharp was questioned outside the jury's presence regarding his qualifications, and he was also asked questions about blood spatter analysis generally. He said that blood "has a consistent reoccurring pattern that can be reproduced scientifically, and others can take your work and come to the same conclusions, which makes it a scientific pattern of fact." He said that "blood spatter is taught both in some of your basic training, some of your homicide schools, special classes just in blood spatter; also in . . . crime scene reconstruction."

On cross-examination, Lieutenant Tharp acknowledged that the eighty hours of advanced training he referenced at the hearing on the motion in limine was eighty hours of training on blood spatter, not just general forensics. He also said that he "just went back and took another year and-a-half of chemistry, so I probably have enough credits there, but I've not applied for the degree." Regarding the testing methods of blood spatter analysis, he said, "Somebody else could take our measurements, our photos, and they could go and recreate and come to the same conclusion that we did." Furthermore, he added, "There is no error rate in blood spatter. . . . There is always a possibility of mistake with an analyst, but the science is infallible."

Most of Lieutenant Tharp's testimony in front of the jury concerned his collection of the evidence at the crime scene; that testimony is summarized above. Most of the questions he was asked in front of the jury regarding the methodology of blood spatter analysis were also asked in the jury-out hearings; as such, we will not summarize his answers to these repeated questions here.

*Investigator Hamstra's Testimony Regarding Her Qualifications and Analysis in this Case*

At the pretrial motion in limine hearing, Investigator Hamstra testified that she held a master's degree in forensic science from the University of Alabama at Birmingham (UAB), and that she had also taken the week-long course on blood spatter analysis at the National Forensic Academy. She said that a "large portion" of her forensic biology course at UAB addressed blood spatter analysis, although on cross-examination she acknowledged that "we didn't do the entire semester on blood spatter. That was just one portion of the class." At the end of Investigator Hamstra's testimony, which occurred after Lieutenant Tharp's testimony and during which she was not asked as many questions as was he, the trial court ruled that she would be able to give expert testimony regarding blood spatter analysis.

All of Investigator Hamstra's testimony at trial occurred in front of the jury. She explained that to become a crime scene investigator, she underwent "practical training, training under an

experienced crime scene investigator, learning from them, observing them on scenes . . . ." She also recounted her education and training, outlined above, adding that the blood spatter training at the National Forensic Academy was one week in a ten-week course on crime scene investigation.

Investigator Hamstra then explained the principles behind blood spatter analysis, which she described as "really just taking well established principles in mathematics and physics that have been developed over . . . thousands of years." She explained that patterns resulting from blood striking a flat surface differ depending on the angle at which the blood hits the surface; blood striking a surface at a ninety-degree angle results in a "round, symmetrical drop," while blood hitting the surface at sharper angles results in a "longer oval drop." She said that in examining blood spatter, she measured both the width and length of each drop, divided the width by the length, and then using geometric and trigonometric functions, she determined the angle at which each drop struck the surface. Investigator Hamstra said that the smoothness of the surface the blood strikes only affects the shape of the blood drop somewhat and does not affect the angle of impact. She also said that the fact that the wall from the defendant's house had been broken when she tested it did not affect her results.

Investigator Hamstra also explained that the size of the blood drop indicates the velocity at which the blood strikes the surface; drops of one millimeter or less indicate "high velocity blood spatter," drops between one and three millimeters indicate "medium velocity" spatter, while drops of three millimeters or greater indicate "low velocity" spatter. She said that gunshot wounds generally resulted in high velocity spatter, although such wounds could also result in medium velocity spatter. She also said that the velocity at which blood strikes a surface does not affect her calculations regarding the angle of impact.

On cross-examination, Investigator Hamstra said that she had been employed by the Bradley County Sheriff's Department for two years. She said that while she had worked part-time in the department's forensic lab since she began working for the department, and while she had her master's degree at the time she began working there, she had only been a full-time crime scene investigator since December 2007. She added that this case was the first homicide investigation on which she had worked.

*Standard of Review*

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. McDaniel v. CSX Transp., Inc.*,* 955 S.W.2d 257, 263-64 (Tenn. 1997). Pursuant to Rule 702 of the Tennessee Rules of Evidence, an expert may testify "in the form of an opinion or otherwise" when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Rule 703 of the Tennessee Rules Evidence requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). "A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party." Brown v.

<u>Crown Equip. Corp.</u>, 181 S.W.3d 268, 273 (Tenn. 2005) (citing <u>Stevens</u>, 78 S.W.3d at 832).

*Expert Qualification of Investigator Hamstra*

The defendant first argues that Investigator Hamstra was not qualified to offer expert testimony in the field of blood spatter analysis.[3]  "When assessing the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of his or her expertise." <u>State v. Scott</u>, 275 S.W.3d 395, 402 (Tenn. 2009) (citing <u>Stevens</u>, 78 S.W.3d at 834).  "This determination hinges upon whether the proposed expert's testimony authorizes him or her to give an informed opinion upon the fact or issue for which his or her testimony is being proffered." <u>Scott</u>, 275 S.W.3d at 402 (citing <u>Stevens</u>, 78 S.W.3d at 834).  "The witness may acquire the necessary expertise through formal education or life experiences." <u>State v. Reid</u>, 91 S.W.3d 247, 302 (Tenn. 2002) (citation omitted).  "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." <u>Id.</u>

The defendant asserts that Investigator Hamstra had "zero applied competence or experience as a professional law enforcement officer in this area of expertise."  The defendant also argues that Investigator Hamstra was not qualified because "she had no prior experience testifying as an expert" and because "this case was her first homicide investigation as a trained investigator."  However, the trial court qualified Investigator Hamstra as an expert based upon her academic and professional training, as was within its discretion.  Despite her relative lack of work experience at the time of trial, the witness was able to offer testimony regarding the "science" and methodology behind blood spatter analysis which established that she possessed "superior . . . training, education, or knowledge within" the area of blood spatter analysis such that "her degree of expertise [was] beyond the scope of common knowledge and experience of the average person." <u>Reid</u>, 91 S.W.3d at 302.  We therefore conclude that the trial court did not abuse its discretion in qualifying Investigator Hamstra as an expert in the field of blood spatter analysis.

*Reliability of Blood Spatter Evidence*

The defendant also argues that "the basis for [Investigator Hamstra's] opinion in this case was flawed because of the method [in which] the blood splatter [sic] evidence was collected and tested by" the Bradley County Sheriff's Department.  The defendant argues that the evidence was unreliable because the wall on which the victim's blood was found was not tested at the crime scene but was rather removed from the defendant's home and tested at the sheriff's department crime lab.  Specifically, the defendant argues that the testing at the lab was unreliable because: (1) "the section of the wall removed contained a baseboard which was about two and one half inches and was not removed"; (2) the wall broke apart in transit from the defendant's house to the crime lab; and (3) the wall leaned slightly against the crime lab's garage door when it was tested.

---

[3]  The defendant does not challenge Lieutenant Tharp's qualification as an expert witness.

Tennessee Rule of Evidence 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." However, in this case the defendant has not established that the manner in which the police collected and tested the blood spatter evidence rendered it unreliable and inadmissible. On appeal, the defendant cites to no authority suggesting that blood spatter analysis of blood stains found on a wall are reliable only if the wall is tested at the scene. Furthermore, in our view the circumstances surrounding the collection, transportation, and testing of the wall concerned the weight of the experts' testimony rather than the testimony's admissibility. The defendant thoroughly cross-examined both expert witnesses regarding their collection and testing methods, thus bringing to light any deficiencies associated with the data collection and testing methods in this case. We therefore conclude that the trial court properly allowed Lieutenant Tharp and Investigator Hamstra to offer expert testimony in this case.

## II. Sufficiency of Evidence

The defendant also argues that the evidence was insufficient to support his conviction for second degree murder. An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was convicted of second degree murder, which Tennessee's criminal code defines as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). Second degree murder is a result of conduct offense. State v. Faulkner, 154 S.W.3d 48 (Tenn. 2005); State v. Page, 81 S.W.3d 781 (Tenn. 2002); State v. Ducker, 27 S.W.3d 889 (Tenn. 2000) Therefore, a knowing act of second degree murder requires one to be "aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

In this case, the evidence produced at trial, viewed in a light most favorable to the State, showed that the defendant and the victim, who were romantically involved, had a history of arguments, including one that occurred the night the victim died. The victim died after being shot once in the face with a gun later found in the defendant's truck. Cleveland Police Department Detective Dean Beverly testified that the victim was subpoenaed to give grand jury testimony in a criminal case against the defendant, one which could have led to significant prison time for the

defendant, given his prior criminal history. Two forensic investigators from the Bradley County Sheriff's Department, who were qualified as expert witnesses, testified that given the location and angle of the blood spatter patterns on the wall near which the victim was located when she was shot, the victim's head was at most three feet above the ground when she was shot. Furthermore, despite the victim's history of drug abuse and mental illness, the medical examiner ruled that the victim's death was a homicide, rather than a suicide. The medical examiner found no evidence of "hesitation marks," or self-inflicted knife wounds on the victim's wrists, and Teresa Cochran, the victim's friend who was present with her shortly before her death, said that the victim did not mention wanting to take her own life and looked forward to attending her son's birthday party the next day. The defendant contended that the victim took her own life, was standing against the wall when she shot herself, and had no intentions of testifying against him in the investigation involving his former employer, but the jury chose to disregard this evidence, as was its prerogative.

Additionally, the evidence showed that after the victim died, the defendant cleaned the victim's blood from the scene before placing the victim's body in a trash can and burying it in a cemetery. The defendant admitted sealing the trash can tightly so that no smell would emanate from it, thus keeping animals from finding the victim's body; the medical examiner testified that it took her "about two hours" to remove the duct tape sealing the trash can. Additionally, when a police officer in a nearby county attempted to stop the defendant for a traffic violation nearly three weeks after the victim died, the defendant eluded the officer, eventually fleeing to Bay County, Florida, where he was arrested. "A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985); see State v. Caldwell, 80 S.W.3d 31, 40 (Tenn. Crim. App. 2002). Similarly, "Any attempt by an accused to conceal or destroy evidence . . . is relevant as a circumstance from which guilt of the accused may be inferred." Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978); see also State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997). We therefore conclude that the evidence produced at trial was sufficient for the jury to find the defendant guilty of second degree murder.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE